NORTHLAKE COMMUNITY HOSPITAL, Plaintiff-Appellee, *v.* DR. LAWRENCE M. CADKIN, Defendant-Appellant.

First District (2nd Division)   No. 76-1011

Opinion filed November 22, 1977.

Robert D. Allison and Arthur T. Susman, both of Chicago, for appellant.

Michael W. Ford and William G. Shur, both of Chicago, for appellee.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

Defendant appeals from a judgment of the circuit court in favor of the plaintiff for $6,098.10. The issues on appeal are (1) whether a promissory note for $6,098, executed by the defendant and made payable to the hospital, was supported by consideration, and (2) whether the hospital failed to prove ownership of the note at trial.

Plaintiff (hospital) and defendant, a medical doctor, entered into an oral agreement on or about October 1, 1970, whereby defendant was to associate himself with the hospital for the purpose of practicing the medical specialty of anesthesia. The arrangement was characterized by the parties at trial as a "fee for service" basis. Under this arrangement, defendant was to bill his patients directly rather than draw a salary. In addition, the parties agreed that for any month in which defendant's cash receipts from his private patients failed to exceed the sum of $3,000, the hospital would issue a check to defendant for the difference between the cash receipts and $3,000.

Defendant commenced to perform services for plaintiff in the first part of October 1970. Between October and January, 1971, the hospital issued to defendant six checks on a semi-monthly basis for a total of $6,098.10. The record does not reflect that any checks were issued after January 4, 1971.

Defendant's association with the hospital lasted for only a period of approximately one year. On September 24, 1971, shortly before the end of the association, the hospital business manager and comptroller, Raymond Priem, summoned defendant to his office. There, defendant executed a demand promissory note for $6,098 payable to 'NCH Partnership D/B/A Northlake Comm. Hospital."

Subsequently, several demands were made upon defendant to pay the note. On May 30, 1972, plaintiff commenced this action.

Raymond Priem testified that he was present at a meeting prior to the commencement of defendant's association with the hospital, at which the terms of the oral agreement were discussed and agreed upon. According to Priem, the agreement between the hospital and defendant was that defendant "should earn" at least $3,000 per month and that the hospital would loan him the difference between "whatever he billed" and $3,000. When defendant's "billings" for a given month exceeded the sum of $3,000, defendant was to apply the excess to repay the loan. The agreement was not, to Priem's knowledge, reduced to writing, nor was it for a specific period of time.

After defendant began to work at the hospital, Priem testified, he and defendant would meet once a month to go over defendant's records, total his billings and his cash receipts, and determine whether or not the hospital should issue a check.

Priem also testified that he met with defendant on September 24, 1971, to discuss the amount of money defendant owed the hospital. They agreed to a figure of $6,098. Prior to leaving Priem's office, defendant executed the promissory note in that amount. Priem did not know the total amount of defendant's income from his patients during the period he was associated with the hospital.

John Cannaven, who testified that he was a "partner" and had an ownership interest in the plaintiff hospital, testified that he was also present when the oral agreement with defendant was discussed. He testified that defendant told hospital administrators that he was accustomed to a lifestyle which required a monthly income of $3,000, and that there would be a 30- to 60-day lag between the date on which he would render his services to a given patient and the date on which he would receive payment. Recognizing that in the first 30 days of the association defendant was not likely to have any income from his billings to his patients, the hospital agreed to advance him up to $3,000 for any month in which his cash receipts were less than that amount. When defendant's billings and cash receipts reached an "equilibrium," defined by Cannaven as the point at which defendant's cash receipts exceeded $3,000 a month, defendant was to begin to repay the amount of the advances on a month-by-month basis.

At the end of the hospital's fiscal year, it became apparent to Cannaven that defendant's billing-cash receipts cycle had caught up, and that he was then earning more than $3,000 per month. From time to time, Cannaven would ask Priem if defendant was still drawing checks or if he was repaying the advances. Priem told him that defendant was doing neither, and that defendant had offered a number of explanations for his delay in commencing repayment.

Cannaven testified that he and Priem discussed the idea of obtaining a

note from defendant. He testified that he was present at the September 24, 1971, meeting in Priem's office where he observed defendant sign the note. The meeting took four or five minutes "at the most." Defendant was there long enough to have read the note. He also testified on cross-examination that if, during the year in which defendant was associated with the hospital, he earned less than the sum of $36,000 from his private patients, defendant would not owe the hospital any money. He also testified, however, that the hospital did not deduct the amounts advanced to defendant as a business expense on its tax returns.

Dr. Cadkin testified that his status with the hospital was that of a private physician on the hospital's staff. He handled his own billing. The basic terms of the disputed oral agreement with the hospital were decided upon in a meeting between a Mr. Doyle and him.[1] No one else was present at that meeting. According to defendant, he told Doyle that he needed an income "for the year" of $36,000, or $3,000 per month. Doyle assured him that he would make that much and that, because defendant was taking on responsibilities at the hospital in addition to his regular duties as anesthesiologist, the hospital would "help" him out. Doyle agreed to guarantee defendant an income of $36,000 from October 1, 1970, to October 1, 1971, and to advance him up to $3,000 per month until such time as his income became greater than that amount, at which time the payments were to cease. A meeting was to take place at the end of the year, at which it would be determined whether his income had exceeded $36,000. If it had, he was to repay the advances to the hospital in the amount by which his income had exceeded $36,000. As it turned out, the meeting contemplated by the agreement never occurred.

Defendant went on to testify that at the end of 1970, he received from the hospital a copy of Internal Revenue Service Form 1099 ("U.S. Information Return for Calendar Year") which showed that the hospital had made certain payments to him during 1970. However, as the amount shown on the form exceeded the total of the advances actually made during 1970 under the agreement, it was incorrect. He paid income tax on the correct amount of the advancements and notified the government that the 1099 form was incorrect. He requested a corrected form from the hospital. On the morning of September 24, 1971, while he was in surgery, he was twice notified that Priem wanted to see him before he left the hospital that day. Because September 24 was a Jewish holiday, and defendant had to leave the hospital early to attend religious services, he did not wish to meet with Priem that day. As he was changing his clothing to leave, Priem called and told him that he had a corrected tax form for

---

[1] The record is unclear as to Doyle's capacity with the hospital. The only other reference to Doyle is contained in the cross-examination of John Cannaven. There, Cannaven referred to Doyle as "our superintendant." Doyle was not called to testify by either party at the trial.

him to sign and that it would only take a second. Defendant went to Priem's office and Priem handed him what he thought was the corrected tax form, which turned out to be the note for $6,098. In a hurry to leave, he signed the document and left the hospital. There was no meeting, no discussion of any amounts he owed the hospital, and no examination of his records. Defendant testified that in the year he was associated with the hospital, he earned less than $36,000 from his patients.

On cross-examination, defendant was asked the following question and gave the following answer:

"Q. So now you are not sure whether what you signed was a W-2 or a 1099 or a promissory note.

A. At the time I signed it, I thought it was a tax form, but you don't sign a W-2 or a 1099, do you?"

Documentary evidence admitted at the trial consisted of six checks issued by the hospital to defendant for a total of $6,098.10, the promissory note for $6,098, the check stubs which accompanied the checks and which showed how the amount of each was calculated,[2] copies of IRS Form 1099 issued to defendant by the hospital for the years 1970 and 1971, and defendant's Federal income tax returns for the years 1970 and 1971.[3]

The trial court entered judgment for the plaintiff for $6,098.10. The judgment order found the issues against the defendant and assessed damages against the defendant in the amount of $6,098.10. Thereafter defendant's motion to vacate the judgment order on a theory that the note lacked consideration was denied.

## I.

■■■ Under article III of the Uniform Commercial Code (UCC), want or failure of consideration is a defense as against any person not having the rights of a holder in due course, except that no consideration is necessary for an instrument or obligation thereon given in payment of, or as security for an antecedent obligation of any kind. (Ill. Rev. Stat. 1975, ch. 26, par. 3—408.) There is no dispute between the parties that if there was consideration for this note, it was in the nature of an antecedent debt of the defendant to the plaintiff arising out of the oral agreement entered into prior to the commencement of defendant's association with the hospital. Whether or not defendant was indebted to the hospital at the

---

[2] These stubs show that checks were disbursed to defendant on a semi-monthly basis. The amount of the advances were calculated by subtracting the amount of the cash receipts from $1,500 (½ of the maximum monthly advance).

[3] Apparently, defendant introduced his income tax returns to support his testimony that he did not earn $36,000 from October 1, 1970, to October 1, 1971, and to show that he paid income taxes on the advances. The returns, however, are not conclusive of either fact because they are based on the total amount of defendant's income in a calendar year, and not on a year running from October to October.

time he executed the note, in turn, depends on the particular terms of the oral agreement and their application to subsequent events. Both the terms of the agreement and their application are questions for the trier of fact. In a bench trial, the trial court acts as a jury, weighs the evidence, and determines the credibility of the witnesses. Its findings are entitled to great weight on appeal and should not be set aside unless clearly against the manifest weight of the evidence. (*Ross v. Thomas* (4th Dist. 1977), 45 Ill. App. 3d 705, 709, 360 N.E.2d 126.) Under sections 3—307(2) (where the signature is admitted or established) and 3—408 of the UCC (Ill. Rev. Stat. 1975, ch. 26, pars. 3—307(2), 3—408), consideration for a negotiable note is presumed and the burden is on defendant to show the lack thereof. *First National Bank v. Achilli* (2d Dist. 1973), 14 Ill. App. 3d 1, 6, 301 N.E.2d 739; *Levin v. 37th Street Drug & Liquors, Inc.* (1st Dist. 1968), 103 Ill. App. 2d 248, 253, 243 N.E.2d 504.

The evidence presented at the trial of this cause is conflicting in many respects, most significantly on the issues of whether the contract was one for a guaranteed income of $36,000 for a period of one year, and whether, if defendant's income during the year did not reach $36,000, he would be indebted to the hospital for the amount of the advances. Raymond Priem testified in substance that whether or not defendant earned $36,000 in a year's time, he would have to repay the advances. John Cannaven testified that if defendant did not earn $36,000 in a year's time, he would owe the hospital nothing. Defendant testified that the basic terms of the agreement were for a period of one year with an income of $36,000 guaranteed by the hospital. He further testified that these terms were agreed to by the hospital at a meeting between he and Doyle, and that his income in the year did not reach $36,000. Doyle was not called to testify to corroborate defendant's testimony. Defendant's income tax returns, as we have noted, are inconclusive.

■■ Regardless of the conflicts in the testimony, one fact stands out, that defendant placed his signature on the promissory note. In his pleadings and in his testimony, a cornerstone of the defendant's case was the suggestion that the note was executed as the result of the misrepresentations of the hospital, through Priem, that the form to be signed was a corrected tax Form 1099.[4] At trial, however, defendant volunteered his knowledge that no signature is necessary on a W-2 or 1099 form. Defendant thus knew that he was not signing such a form.[5] On this state of the record, we cannot say that the judgment of the trial court was contrary to the manifest weight of the evidence.

[4] We note that defendant has not raised this argument in his brief or in oral argument before this court.

[5] In his reply brief, defendant argues that because it is the promissory note which gives rise to a presumption of consideration, the execution of the note may not also be considered as

## II.

Defendant argues that the plaintiff failed to prove ownership of the note. The basis for this contention is that while the note in question was made payable to "NCH Partnership D/B/A Northlake Comm. Hospital," the pleadings filed by counsel for the plaintiff bear the designation, Northlake Community Hospital, an Illinois Corporation. Defendant contends there was no evidence presented to show how the corporation acquired the note of the partnership.

■■ The record indicates that defendant did not raise this argument before the trial court. Defendant relies on his verified answer as placing ownership of the note in issue. It states only: "Defendant denied each and every allegation of Paragraph 1." Paragraph one of the plaintiff's complaint contained an allegation that plaintiff was the owner of the note. These are the only references to this issue preserved in the record. Defense counsel did not present this point in the trial court. No testimony was presented on this issue. Defendant did not raise it in his post-trial motion to vacate the judgment. Defendant's conduct throughout this litigation *assumed* plaintiff's ownership of the note. While defendant was not obligated to present evidence to refute plaintiff's ownership of the note, he may not in good faith maintain his silence until after he has received an adverse judgment in the trial court and the case is on appeal. Defendant has, therefore, waived our consideration of this issue. See *Lein v. Pietruszewski* (1st Dist. 1974), 24 Ill. App. 3d 784, 786-87, 321 N.E.2d 442, *aff'd*, 61 Ill. 2d 350, 335 N.E.2d 772; *In re Estate of Kime* (3d Dist. 1976), 42 Ill. App. 3d 505, 510, 356 N.E.2d 350.

In connection with the issue of whether plaintiff was the owner of the Cadkin note, plaintiff filed in this court a motion to amend its complaint under Supreme Court Rule 362. (Ill. Rev. Stat. 1975, ch. 110A, par. 362.) The motion sought to delete the phrase "an Illinois Corp." from the caption of the complaint. Attached to the motion was an affidavit of one of the attorneys for the plaintiff, stating that the amendment was necessary to conform the pleadings to the proofs which, it was stated, proved that "Northlake Community Hospital" was not an Illinois corporation, but the name under which the "NCH Partnership" did business.

Supreme Court Rule 362(d) permits amendments of pleadings in the reviewing courts. Under it, defendant had five days in which to file

---

evidence of an antecedent debt. In support of this proposition, defendant cites *Bassett v. Heiens* (4th Dist. 1940), 307 Ill. App. 426, 30 N.E.2d 528. We have carefully read that case and do not agree with defendant's interpretation. Absent credible proof that the note was obtained through fraud or duress, the action of the defendant in executing a promissory note may be considered as evidence of the existence of an antecedent debt.

objections to the motion. No objections having been filed with this court, on November 3, 1976, we granted plaintiff's motion to amend.

When defendant's brief was subsequently filed, he also filed a motion seeking leave to file, *instanter*, objections to the motion to amend. This motion was accompanied by the affidavit of defendant's attorney which stated that although he had been served with a copy of plaintiff's motion, he had misapprehended its nature and had thus failed to file a timely response. We agreed to consider defendant's objections with the case.

Defendant's objections to the motion are that the record supports only the conclusion that plaintiff is a corporation, and that plaintiff failed to prove how it obtained possession of the Cadkin note from the partnership/payee. In support of these contentions, defendant relies on the caption on plaintiff's sworn complaint (the very subject of the plaintiff's motion to amend), and on a reference by witness John Cannaven to his status as a "director" of the hospital during his testimony at trial.

We have carefully reviewed the record in this case and find defendant's objections without support therein. Cannaven's reference to his status as a director is consonant with his title at the hospital of "Service Director." Furthermore, numerous other instances in the record,[6] support the conclusions that plaintiff is *not* a corporation and that the caption on the complaint was in error. We therefore adhere to our ruling of November 3, 1976, granting plaintiff's motion to amend.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS and PUSATERI, JJ., concur.

---

[6] For example, at another point in his testimony, Cannaven referred to himself as a "partner."